May it please the Court. Michael Rubin. With me is Dorothea Langsam for Mr. Horton. We intend this morning, unless the Court has questions about other issues or wants us to discuss other issues, to focus on the Brady issues. Ms. Langsam is prepared, if the Court has any questions, on the ineffective assistance of counsel issue pertaining to the advice to Mr. Horton not to testify, to answer those questions. Otherwise, I'll be addressing the issues in the case. The Brady issue in this case is an issue of materiality. Mr. McLaurin's declaration, filed in 1995, states that the police came to arrest him for the murder of Herschel Bowser, but that if he agreed to be the prosecution's star witness and give testimony against Mr. Horton, my client, he would get immunity, he would not have his probation revoked. The question is simply whether the failure of the prosecution to disclose that deal undermines the confidence in the ultimate jury verdict in this case. Had the deal been disclosed, defense counsel could have impeached Mr. McLaurin very effectively, both to establish his motivation for testifying against Mr. Horton the way he did, and also could have impeached him to establish that he lied under oath during the preliminary hearing. Is there anything in the record that shows that the prosecutors were – had knowledge about this deal? There's nothing, but the Supreme Court and Kiles in this Court in subsequent cases have said it doesn't matter, that the prosecutor is responsible for any deals that the police make with a witness, whether the prosecutor knows about it or not. So as a constitutional matter, as a matter of the issues before this Court, it doesn't matter whether the prosecutor knew or not. We'll never find out because the prosecutor is no longer alive. But if the police offered a deal, and so far the only evidence in the record is that the police did offer precisely this deal that Mr. McLaurin testified to, then you have a Brady violation, and the question is what is the impact of that violation on the conviction of Mr. Horton in this case. Now, in determining materiality, what the Supreme Court again in Kiles, and what this Court in Singh, Carriger, Gant, and other cases have said, is the first thing you look to are the words of the prosecutor himself. You start by looking at the closing argument to see what the prosecutor thought were the most important issues, were the contested issues, were the matters that affected the jury's deliberation the most. And here, we've quoted extensively and cited in the Second Amendment petition and in our briefs, the prosecutor kept emphasizing that McLaurin was the key to the case. McLaurin was the most important witness in the case. The prosecutor went through, summarized in very graphic and powerful detail, the testimony of Mr. McLaurin that purported to state that Mr. Horton had purported to confess to the crime and had given details of the crime. The DA recounted that and asked the jury to convict based on that, also testified as to the credibility of Mr. McLaurin, and explained why, in his view, based on his reading of the evidence, Mr. McLaurin was a credible witness whose testimony was sufficient. Now, the jury heard all kinds of, you know, when Mr. McLaurin testified and when he was cross-examined, there was a substantial amount of testimony brought out about the use of cocaine and, you know, all kinds. Absolutely. They were just on a wild high that weekend. There's no question. On a Friday, Saturday. And the State concedes that there was extensive evidence before the jury that called Mr. McLaurin's credibility in doubt. There was his drug use. There was his participation. There was the fact, and you see it particularly when you read the cross-examination, that Mr. McLaurin was unable to string together sentences. He was unable to remember specific details, specific events. He was yet, yet, he didn't admit the most important lie, which is the lie he made at the preliminary hearing about not having had a deal. And he admitted he lied to defense counsel. His testimony is essentially incomprehensible except for those parts of it which are independently corroborated in the record. That's not true, Your Honor. First of all, in terms of the case law. The case law, Killian v. Poole, Phillips v. Woodford. Well, I'm not talking about the case law. I'm talking about the record in this case. Yes. None of those details are corroborated in a sense that would not undermine the outcome. The fact that the murder occurred with a hammer, the fact that the cocaine bags had X's on it, the name of the supplier. I understand. We've gone through all. And Horton's conduct himself. I mean, Horton basically, I mean, Graham and Dorn both testify that the hammer was given, the hammer was Dorn's. Graham gave the hammer to Horton, never saw him again. Your Honor, there is not a piece of evidence in the record corroborating Mr. McLaurin's testimony that, first of all, cannot be explained as in Carriager and Singh as innocuous, but more. Carriager had a very different case. And there was a direct – there was no evidence at all in that case that Carriager had the record of lying that he actually had. But there was evidence that he was a liar. And that was before the jury. And this Court on Bach said that cumulative evidence, when you have a borderline witness, is sufficient. The evidence that Judge Paez has just emphasized is not evidence that goes to motivation. It's not evidence to whether he lied in front of the jury. The Supreme Court found that there was no issue that has been accomplished, that he may have been an accessory because he drove Horton to the bus station. But let's talk about the evidence that Your Honor pointed to in the previous question. Does that corroborate McLaurin's testimony? First of all, any evidence about what Mr. Horton said McLaurin could have made up? Secondly, any evidence as to the cocaine, the hammer, and so forth? Well, McLaurin's testimony. Here's the point I'm trying to make and get your response to. McLaurin's testimony surely had some effect because he did talk about a confession. But putting that aside, Horton's own statements to Dorn and Horton's own conduct have nothing to do with McLaurin's testimony. Absolutely nothing. Horton's statements to Dorn. Fine. Fine. But if anybody asks whether he has the hammer, Graham should deny, whether he gave me anything, tell Dorn, tell Graham to deny it. Let me discuss each piece of evidence piece by piece. Let's start with the hammer. First of all, was the hammer that's identified as Pupils Exhibit 3 even the murder weapon? Well. The amended petition. There was plenty of evidence that it was. There's also plenty of evidence that there wasn't. The fact that the murder weapon was in a pool of blood, as Sergeant Laporte said, as Carolyn Ebel said, yet Pupils Exhibit 3, which is the. We can debate that. Okay. The real point here is whether any of the stuff that I just reeled off, whether anything McLaurin testified has anything to do with any of the evidence that I just mentioned. Yes. And the first thing that I'm responding to is the hammer, because there is evidence that the hammer that supposedly was given by Michael Graham to Mr. Horton was not even the murder weapon. Secondly, there's evidence that other people had equal access to the hammer that belonged to Mr. Dorn, because both Mr. Cunningham and Mr. McLaurin lived at the Shangri-La Lodge, where that and quite a few other hammers using Mr. Dorn's testimony were maintained. Secondly, Mr. Graham said that although he did lend a hammer at one point to Mr. Horton, he could not identify Pupils Exhibit 3 as the hammer he lent. He didn't remember when he lent it, and he had no way of knowing whether that hammer was ever returned. Next. While the allegation here is that Mr. Horton killed the victim with a hammer, the plan that Mr.  McLaurin testified was that the plan was to use a pipe. That had to do with a pipe or a gun. So if Mr. Horton had a plan that he disclosed to Mr. Dorn that morning. It wasn't talked about, and there was a sidebar having to do with it. But Mr. McLaurin testified that the plan was to use a pipe. Mr. McLaurin's testimony was that the plan was to commit a crime with a pipe, yet the evidence shows that that was not the plan ultimately carried out. Further, with respect to the hammer, it could have come from the toolbox. There are plenty which was lying next to the victim. It could have been the victim's own hammer. There are plenty of ways in which had McLaurin been further impeached because of his lies, because of his motivation to create this story to save himself, the jury would have reached a different result. There were no, the State could have called Anthony Wilson, Dooney Cunnigan, McLaurin's girlfriend, anyone else who was supposedly there at the time of the planning and discussion to corroborate Mr. McLaurin's testimony. They didn't. An adverse inference should be drawn from that. There were other people purportedly present when these statements were made. None of them testified. As far as the statements made to Mr. Dorn, I have something to do, this is the day before the murder, and if I do it, I'll be leaving. Well, all the testimony at trial was that the supposed plan that Mr. McLaurin talked about wasn't even developed until that night. So Mr. Horton didn't have any such plan in the morning, and it wouldn't have made any sense for Mr. Horton and Mr. Dorn, and instead of robbing the victim, if that was in fact what Mr. Horton planned to do before he left, as he told Mr. Dorn, in fact, they paid $500 or $600 to the victim, supposedly according to Mr. McLaurin, to purchase some cocaine. The ‑‑ there is testimony that could be read as corroborating elements of Mr. McLaurin's testimony, but none of it independently stands by itself. And without Mr. McLaurin's testimony, none of it is sufficient to convict and certainly undermines confidence in the verdict. Mr. McLaurin could have gotten all of those details from the police report that he admitted he read before he testified. There is no evidence that he saw the police report before the preliminary hearing, and he testified substantially to the same things in the preliminary hearing as he did at trial. There's no testimony one way or another whether he did or didn't. No one asked him whether he read the police report. There's nothing to show that that's thoroughly erroneous. No. There was no finding by the magistrate judge that he did not read the police report before the preliminary hearing. The magistrate ‑‑ There's nothing to show he did, is what I'm saying. That's correct. All right. But there is reasonable probability that the jury would have reached a different result. The jury asked ‑‑ not only did the jury ask to have Mr. McLaurin's testimony read back in its entirety, which, as Gant points out, is a factor to consider, and not only did the jury take four days before deciding, but there were four days of guilt-phase deliberations. The jury struggled with this. But the jury also asked a question. May witnesses review police reports? This is Court Transcript 541. May they review police reports containing other people's testimony before they testify? The jury was focused on McLaurin. The jury was concerned about McLaurin, whether he was testifying accurately. He was, as Judge Paez points out, a borderline credible witness. The borderline credibility had to do with factors that were different than and cumulative to the basis for the attack that competent defense counsel would have made had they known about the deal. Had they known about lying under oath in the preliminary hearing. That is sufficient under the case law that we cited to establish materiality under Brady. Then you have all the additional factors. You have the jury instruction. All these are set out in the amended petition at paragraph 180. The jury instruction that tells the jurors you cannot consider why other people may not have been prosecuted for their role in these crimes. You have the jury instruction in which the jury was told the testimony of a single witness is enough to convict. And you have the rejection of the jury instruction proposed by defense counsel in which the jury, in which defense counsel asked for an instruction saying, treat this testimony with distrust, as many cases, Bernal Abiso and many others say, is important. Coupled with all of that, the poor jury instructions, which heightened the impact of McLaurin's testimony and precluded the jury from considering what this Court and the Supreme Court have said jurors must consider in evaluating an informant's testimony, and certainly from considering the motivation if there's a Brady violation in a deal. You also have the ineffective assistance of counsel issues, which we raise and seek a certificate of appealability on. I've seen below five minutes. I'd like to reserve time. I'm going to break it down. And that is, did the district court actually make a finding that there was a deal? No. The district court simply adopted the findings of the magistrate judge. But the magistrate judge — Did the magistrate judge make a finding? No, he did not. He assumed that there was a deal for purposes of his materiality analysis. So if we think that — if we were to think that there was anything to your argument here about materiality, would we have to send this back to the district court, to the There is evidence in the record from which a conclusion can be drawn at this point that there was a deal. One of our certificate of appealability issues is the due process prejudice and repellent delay, and the fact that many of the witnesses, much of the evidence, including McLaurin's court file from 1982, which is the violation for possession of PCP with intent to sell, August 1982, two months before this crime was committed, that file is gone. That is the file that would contain the evidence of the deal, we assume. The DA is dead. We believe that if you consider our appellate delay issue — How about the police? We don't — we have not — Yeah, apparently with the police. We don't know who the police are. We don't know whether we can locate them. We've never had investigative funds for habeas. You don't know who he talked to? Who the police officer was he talked to? We don't. There may be some evidence in a police report. But because the California Supreme Court denied us investigative funds, we've never been able to look into this. May I reserve the rest of my time? Sure. Okay, Mr. Winters. May it please the Court. Deputy Attorney General Lance Winters for the Warden. The district court in this case, adopting the magistrate judge, found that there was no reasonable probability that the results in this case would have been different, assuming that the deal alleged by Petitioner existed. And that finding was correct, that the California Supreme Court reasonably concluded that there had been no Brady violation in this case. As the Court has mentioned before, there was extensive testimony that impeached McLaurin in this case. He talked extensively about his knowledge and use of drugs throughout — Unlike just being an ordinary liar, or like having your mind pickled because you've been on a wild fling for the weekend, a deal that you will not yourself get arrested or you won't have your probation violated on account of anything you did that weekend is a more powerful indicator of serious lying. Well, first, I disagree with that characterization. I think the lies in this case are similar to those kinds of agreements, if you will. The lies to the police were that he denied driving Horton to the bus station. He denied that because he was afraid he was going to get in trouble for it. So the jury was aware that he had previously lied to protect his own skin. And the idea that he had also given a statement in exchange for an agreement is not so different from that kind of evidence, which was elicited. Well, I think that's kind of right at the heart of it. I think it is different. Well, I think the California Supreme Court can reasonably conclude that it's not that different, that it's not so different that with considering all the other evidence in this case, which was substantial, that there's a reasonable probability that the jury would have come to a different conclusion. Just briefly talking about the evidence, as far as the hammer goes, there's really no issue that the hammer in this case was not the murder weapon. It's simply not true that others had access to Mr. Dorn's hammers. Mr. Dorn testified that he kept his hammers in his office, that he only gave them to people that he authorized him to. There's no evidence that McLaurin was one of those people. There is evidence that Graham was one, because he worked for Dorn, and that Horton was one, because he worked for Dorn. Dorn did identify the hammer. The hammer that was found at the scene with blood on it next to the victim, Dorn identified. Now, petitioners tried to take issue with that, claiming that how could he tell it was his hammer? Well, he'd owned a hammer for 12 years. He doesn't have that many hammers. I have a hammer at home. If you threw it in a bag of hammers, I could pick it out in a second. A hammer is something you use in your hand. You see it. When you spill paint on it, you know it, and you recognize your own hammer. There were no fingerprints, is that right? There were none of Horton's fingerprints. I believe the only fingerprint found at the scene was a fingerprint of the victim on his toolbox. Yeah. None of the petitioner's fingerprints were found anywhere. That is correct. As far as the plan being different, Horton takes issue with the proposed plan that Horton said he would use a pipe, and then, in fact, he used a hammer. I think that's substantially similar. That's corroborating. The hammer, like a pipe, is a silent weapon. The whole point was that he did not want to arouse suspicion from nearby neighbors. Horton also takes issue with the idea that the plan was not discussed or created until the night that he spoke to McLaurin, and so how could he have told Dorn these statements beforehand that alleged that sort of implied that he had this plan? Well, there's no evidence. It's simply conceivable that Horton created the plan before he spoke to McLaurin about it, and the idea that he would go to his drug dealer the day before and pay him money is not inconsistent either. Goes to his drug dealer to make sure he knows where the drugs are. Gives him money. That's not a problem. He's going to rob him the next day. He's going to get all that money back. The line was not so different in this case, and the corroboration of McLaurin's statements were significant. As this Court pointed to, the fact that a hammer was used in the crime, the fact that there were three bags of cocaine, two with powder, one with rock. All the bags had X's on them, one with three X's. Combined with the other evidence that already impeached McLaurin's character about he had been in jail for a probation revocation for dirty tests of cocaine. He had extensive use and knowledge of drugs. He had been willing to assist Horton the night of the crime. He, in fact, assisted Horton the day after the crime by driving him to the bus station. And this is not a case that centered all around McLaurin. The jury did request a read-back of all of McLaurin's testimony. Well, certainly the prosecutor thought that it centered around McLaurin, if you read his closing argument. I respectfully disagree with that reading of his closing argument. I think McLaurin was certainly an important piece of evidence. But without the other evidence, McLaurin wouldn't have been credible at all. If it were just McLaurin's testimony, the prosecutor wouldn't have enough. He needed to have the evidence from Carolyn and Bill. He needed to have the evidence from Willie Doran and Michael Graham. That's what made McLaurin credible. At the same time the jury requested McLaurin's testimony, they also requested all of Graham's testimony and all of Abel's testimony and a portion of Willie Doran's testimony. So the jury was simply reviewing all the important evidence, not just McLaurin's. And this idea that, you know, they struggled with this because there were four days of deliberation, I don't think you can read much from the length of jury deliberations in any event. If the jury takes a short time, it's because they rushed to judgment, and if they took a long time, it's because they struggled with the case. I just don't think you can read anything from it other than they just considered the evidence. And although the deliberations stretched over four days, the first and second day were taken up a good chunk of with readback of the testimony, of all the testimony that they had requested. The third day they only met for a half a day, and the fourth day for an hour. So this wasn't even four full days. It's more like two full days. And finally, answering Judge Piles's question about the remand for an evidentiary hearing, I think to the extent if this Court were to find that such a deal would be material, the remand would be for an evidentiary hearing. The notion that there's no way to find out at this point is just too speculative. You know, the ---- What does the record reflect on whether there was a deal? Just the affidavit from ----  Yes. And, of course, as we've noted, that's contrary to his testimony in court. But if we know he's a liar, he probably would have lied about it in court. Or he lied about it in a declaration. Yes, right. So maybe we need to find out. Well, only if it's material, and only if the California Supreme Court unreasonably applied Brady in finding that it was not material. And that's the final inquiry in this case. And I submit that district court reasonably concluded that the California Supreme Court reasonably applied Brady to find that this evidence was not material. Unless the Court has any other questions, I'll submit. I don't think so. Thank you, Mr. Rubin. Thank you, Your Honor. Thank you. Judge Paez, the evidence of the deal is set forth in the Second Amendment Petition at paragraph 174.aiii. Well, I read the declaration that he submitted. In addition to the declaration, the evidence about the other convictions, the fact that he wasn't prosecuted for a long period of time, that his probation wasn't revoked, it's 174aiii. Mr. McLaurin could have committed this murder. Mr. McLaurin had plenty of time from the time he left work until he got there. I mean, there's no evidence of whether he had that much time or not. Well, sure. There's evidence that there was a gap of an hour and a half between the time he left work and the body was found. How long it would have taken him to get where he got. He had his girlfriend's car. He could have driven over there. Had Mr. McLaurin committed the crime, he would have known all the details that he testified to. Had Mr. Cunnigan or Mr. Wilson committed the crime and told Mr. McLaurin, he would have known all the details. Had Mr. McLaurin read the police reports at both instances. You're saying the California Supreme Court's determination that he wasn't even an accessory is reasonable? No. California Supreme Court said he was an accessory. I mean, he wasn't. He was not an accomplice as a matter of law. And, yes, that is unreasonable based on the fact there was. So we've got to assume that that's correct. So, I mean, to me, it just. That's a legal conclusion whether he's an accomplice. The facts that lead to that are the facts enumerated in our brief that could lead this court to reach a different conclusion. But you don't have to. It doesn't matter whether you. What matters is what he did when he did it. There were 12 eyewitnesses who reported seeing someone outside Mr. Bowser's apartment who were never called by defense counsel. It's part of the ineffective assistance of counsel claim. None of them matched Mr. Horton's description. There are witnesses identified in the amended petition of paragraph 174, none of whom. Many of whom cannot be located now. Some of whom can, who could give testimony establishing that Mr. Horton was not guilty of this. There was no direct evidence linking Mr. Horton to this crime. There were no fingerprints, as Judge Fletcher points out. The hammer that was supposedly bloodstained that was introduced in the evidence had no blood. Paragraphs 34 and 54 of the amended petition show other problems with the chain of custody and establishing that the hammer was actually the murder weapon. The – while Mr. McLaurin may have been testifying based on what he was told, if the jury knew that he had lied at the preliminary hearing and had a strong motivation to lie, to shift the blame from himself, because after all, he stated in his declaration, the police came to arrest him initially, not Mr. Horton. They came to arrest him. And it was when he agreed to be the start witness against Mr. Horton that they – he then finally agreed to testify in exchange for immunity. So Mr. McLaurin was implicated by his own admission as to his participation, however the California Supreme Court characterized it. And if you factor in, as this Court's cases and the Supreme Court's cases have said, these additional motivations, and had defense counsel had the opportunity to impeach him based upon his self-interested motivation, the result could have been different.  I just have one last question for Annette. Wasn't he – wasn't Mr. McLaurin's probation revoked or – wasn't he remanded into custody at some point along the way? There was some point later on when the government put him in the same holding cell as Mr. Horton, which again – He had been out of custody and then for some reason or other his probation was revoked or – That's correct. I couldn't quite figure out exactly what it was, but he ended up back in custody. He ended up back in custody for four months as a result of a different violation of probation. One term of his probation, again set forth in the same paragraph of the amended petition, was that he not used drugs. He obviously testified that he used drugs extensively, including on the weekend of October 10th and 11th. That itself should have resulted in the revocation of his probation. It did not. He testified that he was – facts as to which the Supreme Court said he was at least an accessory. He could have been prosecuted for being an accessory. He was not. In fact, if you look at his criminal conviction record, which was not the basis of questioning by defense counsel, or it should have been, if you look at his criminal defense record, the longest stretch of time Mr. McLaurin was not in jail or being prosecuted was the period from shortly after this killing was committed, this crime was committed, until 1986 after everything was resolved. If you look at his court record before then, if you look at his court record from then until the habeas petitions were filed, that is the one gap when Mr. McLaurin is free, when Mr. McLaurin is not being prosecuted. It further supports that there was a deal. It suggests, as does the fact that he was put in the same holding cell as Mr. Horton, that the State knew that he was cooperating with them and were trying to elicit damaging testimony from Mr. Horton, which they were never able to elicit. But again, it corroborates the statement in the affidavit. And had the jury known any of this, it might have reached a different result. Can I answer Judge Paez's question there? Your time is way expired, and we thank you for your argument. Thank you. The matter just argued will be submitted. The Court will stand in recess. All rise. This Court for this session stands adjourned.   adjourned. Nobody heard me just talking about that they're going to do that and they're going on tour. And I guess Judge Lama, is she going to meet up with them or something? She'll be done by then. I'm pretty sure she just... Oh, it starts at 1030? Yeah, I know. Do you want to go back there? That's cool. All right. Well, I bet they don't want to go back to school today. I'm sure they do. They stay here all day. They don't mind staying here. Thank you.
judges: B. Fletcher, Rymer, Paez